# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COW CREEK BAND OF UMPUQUA TRIBE OF
INDIANS; THE KARUK TRIBE; and TOLOWA
DEE-NI' NATION,

    *Plaintiffs*,

    v.

U.S. DEPARTMENT OF THE INTERIOR; DEB
HAALAND, in her official capacity as Secretary of
the Interior; BUREAU OF INDIAN AFFAIRS;
BRYAN NEWLAND, in his official capacity as
Assistant Secretary–Indian Affairs; BRYAN
MERCIER, in his official capacity as Director,
Bureau of Indian Affairs; and RUDY PEONE, in
his official capacity as Acting Regional Director,
Northwest Region, Bureau of Indian Affairs,

    *Defendants*.

Case No. 1:24-cv-03594-APM

## COQUILLE INDIAN TRIBE'S OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

BACKGROUND ............................................................................................................... 1

LEGAL STANDARD ........................................................................................................ 2

ARGUMENT .................................................................................................................... 3

I.      Plaintiffs Are Unlikely to Succeed on the Merits. .............................................. 3

    A.      Plaintiffs Lack a Cause of Action Because There Is No Final Agency
        Action. ......................................................................................................... 3

    B.      Even if the FEIS Were Final Agency Action, Plaintiffs' Claims Fail. .................. 8

        1.      Interior Validly Issued the FEIS Pursuant to Its Authority Under
            NEPA, Interior's NEPA-Implementing Regulations, and BIA
            Guidance. ...................................................................................... 9

        2.      Interior Satisfied Its Tribal Consultation Obligations Under
            NEPA. ......................................................................................... 12

            a.      Interior *Did* Consult Plaintiffs, Consistent with NEPA. ............... 13

            b.      Defendants Were Not Required to Consult with Plaintiffs
                 Under IGRA. ...................................................................... 16

II.     Plaintiffs' Claims of Irreparable Harm Lack Merit. ........................................... 17

    A.      Plaintiffs Do Not Have a Protectable Interest in Maintaining Regional
        Gaming Monopolies. ................................................................................... 17

    B.      The Substitution Impact on Plaintiffs Does Not Constitute Irreparable
        Harm Justifying Issuance of the Proposed TRO. ........................................... 18

    C.      Plaintiffs' Remaining Claims of Irreparable Harm Are Spurious. ...................... 23

III.    The Balance of the Equities Tips Sharply in Coquille's Favor. .......................... 25

    A.      Coquille Will Suffer Irreparable Harm if the TRO Is Granted. ........................ 25

        1.      A TRO Will Cause Coquille Irreparable Harm by Upending Its
            Efforts to Engage in Class II Gaming Activities on the Medford
            Parcel. ......................................................................................... 26

        2.      A TRO Will Irreparably Harm Coquille by Exacerbating
             Coquille Citizens' Unmet Needs. ................................................... 27

CONCLUSION.................................................................................................................30

# TABLE OF AUTHORITIES[*]

**CASES**

*Alpine Securities Corp. v. Financial Industry Regulatory Authority*, 121 F.4th 1314 (D.C. Cir. 2024) .........................................................................................................2, 3

*Andrus v. Sierra Club*, 442 U.S. 347 (1979).........................................................................10, 12

*Bennett v. Spear*, 520 U.S. 154 (1997) ..................................................................................3, 4

*Brown v. Federal Election Commission*, 386 F. Supp. 3d 16 (D.D.C. 2019).................................8

*Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460 (D.C. Cir. 2007) ......................................................................................................................................18

*Citizens for a Better Way v. United States Department of Interior*, No. 12-cv-3021, 2015 WL 5648925 (E.D. Cal. Sept. 24, 2015), *aff'd sub nom. Cachil Dehe Band of Wintun Indians of Colusa Indian Community v. Zinke*, 889 F.3d 584 (9th Cir. 2018) .........................................................................................................................................17

*Dalton v. Specter*, 511 U.S. 462 (1994).....................................................................................7

*Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004).......................................12

*Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93 (D.D.C. 2003) ............................................3

*Fairbanks North Star Borough v. United States Army Corps of Engineers*, 543 F.3d 586 (9th Cir. 2008).........................................................................................................5

*FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109 (D.D.C. 2015) ......................................................3

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)....................................................................4, 7

*Government of Province of Manitoba v. Zinke*, 849 F.3d 1111 (D.C. Cir. 2017) .........................5

*Gros Ventre Tribe v. United States*, 344 F. Supp. 2d 1221 (D. Mont. 2004), *aff'd* 469 F.3d 801 (9th Cir. 2006) ............................................................................................5

*Home Builders Ass'n of Greater Chicago v. United States Army Corps of Engineers*, 335 F.3d 607 (7th Cir. 2003) .................................................................................6

*Kalispel Tribe of Indians v. United States Department of Interior*, 999 F.3d 683 (9th Cir. 2021)...............................................................................................................17, 20

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*Kobach v. United States Election Assistance Commission*, 772 F.3d 1183 (10th Cir. 2014) ................................................................................................................5

*\*Marin Audubon Society v. FAA*, 121 F.4th 902 (D.C. Cir. 2024).............................8, 11

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989).............................12

*Massachusetts Coalition for Immigration Reform v. United States Department of Homeland Sec.*, 621 F. Supp. 3d 84 (D.D.C. 2022)....................................................6

*National Parks & Conservation Ass'n v. Bureau of Land Management*, 606 F.3d 1058 (9th Cir. 2010)....................................................................................................6

*National Parks Conservation Ass'n v. Norton*, 324 F.3d 1229 (11th Cir. 2003) ............6

*Nuclear Energy Institute, Inc. v. EPA*, 373 F.3d 1251 (D.C. Cir. 2004) .........................4

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998).................................................4

*\*Oregon Natural Desert Ass'n v. Bureau of Land Management*, 625 F.3d 1092 (9th Cir. 2010) ..............................................................................................................4, 5

*Preservation Coalition of Erie County v. Federal Transit Administration*, 356 F.3d 444 (2d Cir. 2004)......................................................................................................5

*Quechan Tribe of Ft. Yuma Indian Reservation v. United States Department of Interior*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010) .....................................................15

*\*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)......................9, 12

*Scotts Valley Band of Pomo Indians v. United States Department of Interior*, 633 F. Supp. 3d 132 (D.D.C. 2022)..................................................................................16

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011).........................................................8

*Sokaogon Chippewa Community v. Babbitt*, 214 F.3d 941 (7th Cir. 2000) ..................17

*Stand Up for California! v. United States Department of Interior*, 879 F.3d 1177 (D.C. Cir. 2018) .......................................................................................................17

*Stand Up for California! v. United States Department of Interior*, 919 F. Supp. 2d 51 (D.D.C. 2013) ......................................................................................................17

*WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013) .....................................4

**STATUTES**

5 U.S.C. § 704.....................................................................................................................3

25 U.S.C. § 2719(b)(1)(A) ...............................................................................16

*25 U.S.C. § 2719(b)(1)(B)(iii) .................................................................2, 13, 16

42 U.S.C. §§ 4321 et seq. ...............................................................................3

42 U.S.C. § 4332(2)(C) ...................................................................................9

42 U.S.C. § 4333 ............................................................................................9

42 U.S.C. § 4342 ..........................................................................................10

42 U.S.C. § 4344(3) ......................................................................................10

42 U.S.C. § 4344(4) ......................................................................................10

*Coquille Restoration Act, Pub. L. No. 101-42, 103 Stat. 91 (1989) (formerly
    codified at 25 U.S.C. §§ 715–715g) ...................................................1, 18

Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721 ............................2

**OTHER AUTHORITIES**

25 C.F.R. § 290.12(b)(1)(i) ............................................................................22

25 C.F.R. § 290.12(b)(1)(ii) ...........................................................................22

25 C.F.R. § 290.12(b)(2) ...............................................................................22

43 C.F.R. pt. 46, subpt. E .............................................................................10

43 C.F.R. § 46.10(a) ......................................................................................10

43 C.F.R. § 46.20(a) ......................................................................................10

43 C.F.R. § 46.155 ........................................................................................13

Bureau of Indian Affairs, *Indian Affairs National Environmental Policy Act
    (NEPA) Guidebook*, 59 IAM 3-H (Aug. 2010) .........................................10

Exec. Order 11,991, 42 Fed. Reg. 26,967 (May 24, 1977) ...........................10

*Final Environmental Impact Statement for the Coquille Indian Tribe Fee-to-Trust
    and Gaming Facility Project, 89 Fed. Reg. 92,712 (Nov. 22, 2024) ...................2, 6

Global Market Advisors, Impact Study for the Coquille Development Project,
    August 2019, FEIS Appendix E ...............................................................19

Global Market Advisors, Updated Substitution Effects Analysis for the Coquille Medford Project, June 2023, FEIS Appendix O .....................................................19

Implementation of the National Environmental Policy Act (NEPA) of 1969, 73 Fed. Reg. 61,292 (Oct. 15, 2008).............................................................................................9

Nigel Jaquiss, *The Cowlitz Tribe's Ilani Casino Has Hurt Oregon Lottery and Spirit Mountain Casino Less than Expected*, Willamette Week (May 25, 2018), https://www.wweek.com/news/2018/05/25/the-cowlitz-tribes-ilani-resort-casino-has-hurt-oregon-lottery-and-spirit-mountain-casino-less-than-expected/...................21

National Environmental Policy Act—Regulations, 43 Fed. Reg. 55,978 (Nov. 29, 1978) .......................................................................................................................10

Oregon Lottery official webpage, http://www.Oregonlottery.org/retailer/where-to-play (last visited Dec. 31, 2024) ......................................................................................19

Oregon Office of Economic Analysis, Lottery and Gaming Outlook, 2019, https://oregoneconomicanalysis.com/2019/02/13/lottery-and-gaming-outlook-2019.........................................................................................................................21

The Coquille Indian Tribe ("Coquille") hereby opposes the motion of Plaintiffs Cow Creek Band of Umpqua Tribe of Indians, the Karuk Tribe, and Tolowa Dee-Ni' Nation (collectively, "Plaintiffs") for a temporary restraining order and preliminary injunction. Like Plaintiffs' complaint, Plaintiffs' motion is riddled with factual inaccuracies and devoid of cogent legal theory justifying the extraordinary relief that Plaintiffs seek. Plaintiffs further overstate the legally noncognizable harm that they will allegedly suffer absent their requested relief, while attempting to marginalize the significant and irreparable harms that will befall Coquille and its members if that relief is granted. The Court should recognize Plaintiffs' motion for what it is: a disingenuous attempt to impede Coquille's congressionally authorized rights to rebuild its tribal land base, pursue economic development, and generate much-needed gaming revenue to address the unmet needs of their people. Accordingly, the Court should deny Plaintiffs' motion without delay.

## BACKGROUND

The factual and procedural background to this motion is set forth more fully in Coquille's accompanying motion to intervene. In short, Plaintiffs brought this action in a last-ditch effort to prevent Coquille from commencing gaming operations on a 2.42-acre parcel of Coquille-owned land in the City of Medford (the "Medford Parcel"), in Jackson County, Oregon. In enacting the Coquille Restoration Act ("CRA"), Pub. L. No. 101-42, 103 Stat. 91 (1989) (formerly codified at 25 U.S.C. §§ 715–715g), Congress restored federal recognition to the Coquille Indian Tribe, *see id.* § 3(a), specifically identified Jackson County as one of five Oregon counties comprising Coquille's service area, *see id.* § 2(7), and authorized the Secretary of the Interior to take into trust for the Tribe "any additional acreage in the Tribe's service area" pursuant to her authority under Section 5 of the Indian Reorganization Act, *see id.* § 5(a). Those provisions of the CRA and the IRA enable Coquille, as a matter of law, to conduct gaming on such additional acreage pursuant

to the "restored lands" exception in the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721, which expressly allows gaming on lands that are "taken into trust as part of … the restoration of lands for an Indian tribe that is restored to Federal recognition," *id.* § 2719(b)(1)(B)(iii).

On November 22, 2024, Interior issued the Final Environmental Impact Statement ("FEIS") on Coquille's application to have the Medford Parcel taken into trust.  *See* Final Environmental Impact Statement for the Coquille Indian Tribe Fee-to-Trust and Gaming Facility Project, 89 Fed. Reg. 92,712, 92,712 (Nov. 22, 2024).  The published Notice of Availability ("NOA") accompanying the FEIS states:  "The information and analysis contained in the FEIS, as well as its evaluation and assessment of the Preferred Alternative, will assist the Department in its review of the issues presented in the Tribe's application.  Selection of the Preferred Alternative *does not* indicate the Department's final decision because the Department must complete its review process."  *Id.* (emphasis added).  The NOA also states that the Department will issue its Record of Decision, or ROD, "on or after 30 days from [November 22, 2024]," and that members of the public could submit further comments to inform the Department's final decision until December 23, 2024.  *Id.*

On December 23, 2024, Plaintiffs filed the complaint in this action and a motion for a temporary restraining order ("TRO") or a preliminary injunction ("PI"). Coquille is now moving to intervene and filing this opposition to Plaintiffs' TRO/PI motion.

## LEGAL STANDARD

A temporary restraining order and a preliminary injunction are each "an 'extraordinary remedy never awarded as of right.'"  *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008)).  "The

same standards apply for both temporary restraining orders and preliminary injunctions." *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003).  That is, the moving party must demonstrate that "(1) it 'is likely to succeed on the merits'; (2) it 'is likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the balance of equities tips in [its] favor'; and (4) the issuance of a preliminary injunction 'is in the public interest.'"  *Alpine Sec. Corp.*, 121 F.4th at 1324 (quoting *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 721 (D.C. Cir. 2022)). Where, as here, the Federal Government is a defendant opposing a motion for a TRO or PI, the third and fourth factors merge.  *See, e.g.*, *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 127 (D.D.C. 2015).

## ARGUMENT

### I.      Plaintiffs Are Unlikely to Succeed on the Merits.

Plaintiffs are unlikely to succeed on the merits for two independently sufficient sets of reasons: first, there is no final agency action for this Court to review, and second, even if there were, the Federal Defendants complied with their obligations under the National Environmental Policy Act ("NEPA"), NEPA, 42 U.S.C. §§ 4321 et seq.

### A.  Plaintiffs Lack a Cause of Action Because There Is No Final Agency Action.

Plaintiffs' request for extraordinary relief must be denied for a simple, threshold reason: There is no final agency action.

Plaintiffs have pleaded review pursuant solely to the Administrative Procedure Act ("APA").  The APA provides for judicial review of only "*final* agency action."  5 U.S.C. § 704 (emphasis added).  As the Supreme Court explained in *Bennett v. Spear*, "two conditions must be satisfied for agency action to be 'final.'"  520 U.S. 154, 177–78 (1997).  "First, the action must mark the consummation of the agency's decisionmaking process, it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations

have been determined, or from which legal consequences will flow." *Id.* (internal quotations and citations omitted); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."). Neither condition is satisfied by the FEIS at issue here.

As precedent from this Circuit confirms, an FEIS does not itself qualify as a final agency action; rather, the Record of Decision, or ROD, finalizing the agency's action based on, *inter alia*, the analysis contained in the FEIS reflects the consummation of the agency's decision-making. In *Nuclear Energy Institute, Inc. v. EPA*, 373 F.3d 1251 (D.C. Cir. 2004), for example, the D.C. Circuit held that APA claims concerning an "FEIS will not be fit for judicial review until the FEIS is used to support a concrete and final decision," emphasizing that the agency had "not yet selected a[n] … alternative or sought to use the existing FEIS to support such a decision." *Id.* at 1313; *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733–37 (1998) (refusing to consider a forest management plan where it was uncertain whether and to what extent the plan would be used to support specific future logging decisions); *Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1118 (9th Cir. 2010) (FEIS is not final agency action until it has been "solidified in a ROD"); *WildEarth Guardians v. Jewell*, 738 F.3d 298, 304, 310 (D.C. Cir. 2013) (treating ROD as final agency action in challenge to sufficiency of FEIS). As the D.C. Circuit has spelled out, "[a]fter issuing an EIS, *the agency must also issue a record of decision* ('ROD'), which is a concise public record that describes the agency's decision, [i]dentif[ies] all alternatives considered by the agency, and states whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted…. *The issuance of a ROD constitutes final agency*

4

*action.*"  *Gov't of Province of Manitoba v. Zinke*, 849 F.3d 1111, 1115 (D.C. Cir. 2017) (alterations in original) (emphasis added) (internal quotation marks omitted).

Applying that established rule here, the answer is clear:  There is no final agency action. An FEIS has been issued; but, as Plaintiffs concede, Defendants have not yet issued a ROD establishing what action (if any) they will take in light of the analysis contained in the FEIS.  *See* Compl. ¶ 36; TRO Mot. at 1.  Plaintiffs' citations to out-of-Circuit precedents to support the idea that it may seek review before the issuance of the ROD do not support the proposition for which Plaintiffs cite them, and, in any event, do not refute the D.C. Circuit authority that binds *this* Court.

Both cases that Plaintiffs rely on are two decades old—and unpersuasive.  *Preservation Coalition of Erie County v. Federal Transit Administration*, 356 F.3d 444 (2d Cir. 2004), offered no analysis in support of its characterization of the FEIS at issue as final agency action, and even noted the subsequent issuance of "[t]he ROD—the final document in the administrative process." *Id.* at 453 n.6.  Likewise, *Gros Ventre Tribe v. United States*, 344 F. Supp. 2d 1221 (D. Mont. 2004), *aff'd*, 469 F.3d 801 (9th Cir. 2006), merely stated without analysis that "every environmental impact statement" and "every Record of Decision is a final agency action."  *Id.* at 1226.  And Plaintiff's citation of the *Gros Ventre* case is directly contravened by more recent, controlling Ninth Circuit authority holding that there is no final agency action until "an EIS's analysis has been solidified in a ROD."  *Oregon Nat. Desert*, 625 F.3d at 1118.

As discussed above, the D.C. Circuit has considered and repeatedly rejected the precise argument recycled here by Plaintiffs. And far from permitting review of non-final agency actions, other circuits have characterized this as a jurisdictional defect fatal to any plaintiffs' case.[1]

---

[1] *See, e.g.*, *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1189 (10th Cir. 2014); *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 591 (9th Cir. 2008);

Were there any remaining doubt, Defendants have been crystal clear that they have not rendered a final decision—an independent basis to conclude that *this* FEIS, at least, is not final agency action. Indeed, courts are instructed to look to "the agency's own treatment of the action" to "show that it is not the culmination of the agency's consideration of an issue." *Mass. Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*, 621 F. Supp. 3d 84, 95 (D.D.C. 2022); *see also Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1064–65 (9th Cir. 2010) (even ROD based on EIS does not constitute final agency action where administrative appeal has rendered ROD ineffective under agency's regulations).

Here, "the agency's own treatment" is unequivocal. For example, the published Notice of Availability accompanying the FEIS states: "The information and analysis contained in the FEIS, as well as its evaluation and assessment of the Preferred Alternative, will *assist* the Department in its review of the issues presented in the Tribe's application. Selection of the Preferred Alternative *does not indicate the Department's final decision because the Department must complete its review process*." Final Environmental Impact Statement for the Coquille Indian Tribe Fee-to-Trust and Gaming Facility Project, 89 Fed. Reg. 92,712, 92,712 (Nov. 22, 2024) (emphasis added). Defendants have also made clear that the ROD will be issued "on or after 30 days from November 22, 2024" and provides 30 days for parties to submit further comments to inform the Department's final decision. *Id.* In short, even if *some* FEIS could constitute final agency action (though it cannot under the law of this Circuit), *this* FEIS is not the culmination of the administrative process into a final decision from which legal obligations will flow—so it does not meet the APA's requirements.

---

*Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 614 (7th Cir. 2003); *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003).

Perhaps recognizing that binding precedent so holds, Plaintiffs ask this Court to simply ignore the law and specifically, the requirement that review only occur of final agency action because, they say, waiting for the ROD would "effectively foreclose" review. Plaintiffs' Br. at 20. This very argument, however, runs afoul of Supreme Court precedent. Even if judicial review later became unavailable, that would not render the FEIS reviewable, as the Supreme Court has repeatedly held. *Franklin v. Massachusetts*, 505 U.S. 788 (1992), addressed the Secretary of Commerce's presentation to the President of a report tabulating the results of the decennial census. *Id.* at 798. The Supreme Court there held that the Secretary's report did not constitute "final agency action" because the report carried "no direct consequences" and served "more like a tentative recommendation than a final and binding determination." *Id.* But, because the ultimate decision was the President's, and the President is not an agency under the APA, review of the President's ultimate decision was not reviewable. *Id.* Nevertheless, the Supreme Court concluded that the lack of reviewability of the final decision did not justify ignoring the APA's requirement for final agency action. *See id.*

Similarly, *Dalton v. Specter*, 511 U.S. 462 (1994), addressed the reviewability of recommendations by the Secretary of Defense and the Defense Base Closure and Realignment Commission as to which bases to close. *Id.* at 469. Again, the Court held that the submission to the President was not final agency action since the recommendations were in no way binding on the President, who had absolute discretion to accept or reject them. *Id.* at 469–71. And again, the President's ultimate decision was not reviewable. *See id.* But this did not eliminate the statutory requirement that an APA cause of action requires final agency action. *See id.*

Just so here.  That is, even were the ROD unreviewable as Plaintiffs suggest, that would not justify review of nonfinal agency action preceding it.  Plaintiffs cannot overcome the basic lack of final agency action that renders their cause of action and request for relief altogether invalid.

## B.  Even if the FEIS Were Final Agency Action, Plaintiffs' Claims Fail.

Even if the FEIS were a final agency action subject to judicial review (which it is not), Plaintiffs are unlikely to succeed on the merits of their claims for declaratory and injunctive relief.  And "without a likelihood of success on the merits, Plaintiffs are not entitled to … preliminary [relief] regardless of their showing on the other factors."  *Brown v. Fed. Election Comm'n*, 386 F. Supp. 3d 16, 24 (D.D.C. 2019); *see also, e.g.*, *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) ("a likelihood of success is an independent, free-standing requirement for a preliminary injunction" (quotation marks omitted)).

Each of Plaintiffs' merits arguments stumbles out of the gate.  First, Interior properly issued the FEIS pursuant to the requirements of NEPA and Interior's NEPA-implementing regulations.  Because Interior exercised its authority under NEPA and its own NEPA regulations in issuing the FEIS, the FEIS's references to the CEQ's regulations do not render the FEIS invalid even if the CEQ's regulations were *ultra vires*.  *See Marin Audubon Soc'y v. FAA*, 121 F.4th 902 (D.C. Cir. 2024) (petitions for *en banc* review pending).  Second, as documented in the extensive administrative record supporting the FEIS, Interior consulted with Plaintiffs in compliance with NEPA.  And, contra Plaintiffs, there is no further consultation requirement imposed by IGRA.  This Court's analysis should end there; Plaintiffs cannot establish their entitlement to the extraordinary relief they seek.

8

### 1. Interior Validly Issued the FEIS Pursuant to Its Authority Under NEPA, Interior's NEPA-Implementing Regulations, and BIA Guidance.

The FEIS at issue was validly issued pursuant to Interior's authority under NEPA, Interior's implementing regulations, and related guidance. The legality of CEQ's regulations is irrelevant.

Interior exercised its statutory authority under NEPA in issuing the FEIS. NEPA expressly requires federal agencies to integrate environmental considerations into their decision-making processes, consistent with Congress's goal "to protect[] and promot[e] environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4331). Specifically, NEPA requires federal agencies to prepare a "detailed statement" in connection with all proposals for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Congress was clear: This "detailed statement" must address the "reasonably foreseeable environmental effects of the proposed agency action" and "a reasonable range of alternatives to the proposed agency action." *Id*. To implement that framework, Congress directed federal agencies to "review" their own "statutory authority, administrative regulations, and current policies and procedures" and required them to "propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter." *Id.* § 4333.

Pursuant to this statutory mandate, Interior promulgated Part 516 of its Department Manual, which provides instructions for implementing NEPA and associated Executive Orders and codified the procedures in its regulations at 43 C.F.R. Part 46. *See* Implementation of the National Environmental Policy Act (NEPA) of 1969, 73 Fed. Reg. 61,292 (Oct. 15, 2008). The regulations establish procedures for Interior and its constituent bureaus to comply with NEPA, including a

detailed process for preparing and issuing Environmental Impact Statements, such as the FEIS at issue here.  43 C.F.R. § 46.10(a); 43 C.F.R. pt. 46, subpt. E.

In addition, Interior and its bureaus have issued interpretive guidance to facilitate NEPA compliance.  In particular, the BIA's NEPA Guidebook provides in-depth discussion of the requirements of NEPA, Interior's NEPA regulations at 43 C.F.R. Part 46, Part 516 of Interior's Department Manual, and other applicable authorities, as applied to the BIA.  *See* Bureau of Indian Affairs, *Indian Affairs National Environmental Policy Act (NEPA) Guidebook*, 59 IAM 3-H (Aug. 2010).  Of relevance here, the BIA NEPA Guidebook outlines BIA's policy for tribal involvement in the NEPA process and describes the BIA's obligation to consult with tribal governments under Interior's NEPA regulations.

Separate and apart from its directives to federal agencies, NEPA also established the Council on Environmental Quality ("CEQ").  42 U.S.C. § 4342; *see id*. § 4344(3), (4).  Per a 1977 Executive Order, CEQ promulgated and occasionally revised its own regulations implementing NEPA.  *See* Exec. Order 11,991, 42 Fed. Reg. 26,967 (May 24, 1977); National Environmental Policy Act—Regulations, 43 Fed. Reg. 55,978 (Nov. 29, 1978).[2]

In issuing the operative FEIS, Interior acted squarely within the scope of its authority under the plain text of NEPA and Interior's own implementing regulations, as well as the BIA's

---

[2] The Supreme Court addressed CEQ's 1978 NEPA regulations in *Andrus v. Sierra Club*, 442 U.S. 347 (1979), holding that "CEQ's interpretation of NEPA," in those regulations, "is entitled to substantial deference" because "[t]he Council was created by NEPA, and charged in that statute with the responsibility 'to review and appraise the various programs and activities of the Federal Government in the light of the policy set forth in [NEPA] and to make recommendations to the President with respect thereto.'" *Id.* at 358 (quoting 42 U.S.C. § 4344(3)). Various federal agencies, including Interior, have used CEQ's NEPA regulations as a basis, in part, for their own NEPA-implementing regulations.  In fact, Interior's NEPA regulations provide a crosswalk showing which of its NEPA regulations correspond to CEQ's NEPA regulations and which of Interior's NEPA regulations have no corresponding CEQ regulation.  43 C.F.R. § 46.20(a).

interpretive guidance. The FEIS's plain text states it was "completed in accordance with *applicable requirements*, *including those set out in NEPA* (42 USC 4321 et seq.); the Council on Environmental Quality (CEQ) Regulations for Implementing NEPA (40 CFR Sections 1500 – 1508); and the BIA's NEPA Guidebook (59 IAM 3-H)." FEIS Vol. II, § 1.4 (Pls.' Mem. Ex. 2 at Ex. 2 (Declaration of Gabriel Galanda) (emphasis added)). The "applicable requirements" straightforwardly include Interior's NEPA regulations at 43 C.F.R Part 46, which provide the legal framework for issuance of the FEIS consistent with the "requirements … set out in NEPA." FEIS Vol. II, § 1.4 (Galanda Declaration Ex. 2). In addition, the BIA NEPA Guidebook that the FEIS references cites extensively to 43 C.F.R Part 46, including to provisions of Interior regulations that lack any counterpart in CEQ regulations.

Ignoring the FEIS's plain text, Plaintiffs spill much ink about Interior's failure to pin-cite 43 C.F.R. Part 46. From that omitted citation, Plaintiffs ask this Court to infer that the FEIS "is based exclusively on the CEQ regulations." Pls.' Mem. at 23. As already explained, however, the FEIS was issued pursuant to *all* "applicable requirements," which include Interior's Part 46 regulations as well as Part 516 of Interior's Department Manual and the BIA NEPA Guidebook interpreting the Part 46 regulations. FEIS Vol. II, § 1.4 (Galanda Declaration Ex. 2).

Because Interior validly issued the FEIS pursuant to its authority under NEPA, Interior's NEPA-implementing regulations, and BIA guidance, the validity of this FEIS cannot turn on whether the CEQ regulations are legally valid, a question currently pending in *en banc* petitions before the D.C. Circuit.[3] The FEIS has multiple independent bases of authority and legitimacy,

---

[3] On November 12, 2024, a divided panel of the D.C. Circuit, with the Chief Judge dissenting, held in *Marin Audubon Society* that CEQ's regulations implementing NEPA are *ultra vires* and invalid under separation-of-powers principles. *See* 121 F.4th at 908. Both the petitioners and the respondents in the *Marin Audubon* case have sought *en banc* review of the portion of the panel's majority opinion invalidating CEQ's NEPA regulations as *ultra vires*, on the basis that the panel's

from NEPA's statutory directive, to Interior's implementing regulations, to BIA's interpretive guidance.  And even Plaintiffs are not audacious enough to argue that complying with CEQ's regulations somehow required the Department of the Interior to violate its own NEPA-implementing regulations.

The plain text of NEPA and Interior's NEPA-implementing regulations alone, even absent CEQ's NEPA regulations, provide ample support for the FEIS and any subsequent Interior decision to take the Medford Parcel into trust for the Tribe.  Because Interior issued the FEIS pursuant to its well-established statutory authority to implement NEPA and its NEPA-implementing regulations, the FEIS would not be *ultra vires* and invalid under the separation-of-powers principles even if the CEQ's NEPA regulations were *ultra vires* and invalid.

### 2. Interior Satisfied Its Tribal Consultation Obligations Under NEPA.

Plaintiffs' second claim—that Defendants failed to satisfy their tribal consultation requirements under IGRA and Interior's NEPA regulation at 43 C.F.R. § 46.155—fare no better for two reasons.  First, the administrative record supporting the FEIS demonstrates that Interior consulted with Plaintiffs before issuing the FEIS to comply with NEPA's requirements.  Second, Defendants have no further consultation obligation under IGRA because the basis for Interior to

---

decision subverts the party-presentation principle.  Both the petitioners and the respondents in *Marin Audubon* have asked the *en banc* court to grant the petitions and excise the part of the panel opinion that invalidated CEQ's NEPA regulations.  Those petitions are currently pending.

Though the validity of CEQ's NEPA regulations is irrelevant to this case, the panel opinion holding those regulations *ultra vires* is wrong.  Beginning with *Andrus*, the Supreme Court and federal courts have uniformly approved the regulations.  *See* 442 U.S. at 355–61.  The Supreme Court has since described CEQ as "established by NEPA with authority to issue regulations interpreting it," *Department of Transportation v. Public Citizen*, 541 U.S. 752, 757 (2004), explained that CEQ promulgates "binding regulations," *Robertson*, 490 U.S. at 354, and reiterated that CEQ's regulations "impose a duty on all federal agencies," *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 372 (1989).  While Plaintiffs dismiss these binding Supreme Court precedents as "*Chevron*-like statement[s]," these cases remain good law.

take the Medford Parcel into trust is IGRA's restored-land exception, which does not require such consultation.  25 U.S.C. § 2719(b)(1)(B)(iii).

### a.  Interior *Did* Consult Plaintiffs, Consistent with NEPA.

The undisputed record plainly evinces that Interior satisfied any consultation requirement under NEPA.  As discussed above, Interior issued the FEIS pursuant to NEPA and Interior's NEPA-implementing regulations at 43 C.F.R. Part 46.  Relevant to tribal consultation, Interior's NEPA regulations require it to "whenever possible consult, coordinate, and cooperate with relevant . . . tribal governments . . . concerning the environmental effects of any Federal action within the jurisdictions or related to the interests of these entities."  43 C.F.R. § 46.155.  The FEIS states:  "The BIA has consulted extensively with the Coquille Indian Tribe, the Applicant, and the Cow Creek Band of Umpqua Tribe of Indians."  FEIS Vol. II, § 3.6.4 (Galanda Declaration Ex. 2).  That should end the matter.

Indeed, Plaintiffs acknowledge that all this consultation occurred.  Their chief complaint is that the consultation was not adequately "meaningful[]."  Pls.' Mem. at 23.  But Plaintiffs desire for more "meaningful[]" engagement—whatever that subjective term means—appears nowhere in NEPA, Interior's NEPA regulations, or BIA's NEPA guidebook.  Indeed, the amount or extent of consultation that must occur is nowhere specified in NEPA or Interior's NEPA regulations.

Regardless, the administrative record supporting the FEIS shows extensive consultation, across years of formal meetings and notice-and-comment and public-hearings processes.  To begin, Interior conducted a scoping process for the Draft EIS in 2015 that "included alerting the governments of Cow Creek Band of Umpqua Tribe of Indians, Elk Valley Rancheria, and Karuk Tribe early in the scoping process for the Proposed Action.  The input received from these tribal governments and others, including tribal members in non-governmental capacities, were

considered in the scope of the Draft EIS."  FEIS Vol. I, at 3-32 (Galanda Declaration Ex. 1).

Following the scoping process, Interior consulted with Plaintiffs pursuant to Section 106 of the

National Historical Preservation Act.  FEIS Vol. II, § 3.6.4 (Galanda Declaration Ex. 2).  As part

of Interior's Draft EIS, Interior also conducted an environmental-justice analysis that

"recognize[d] the Cow Creek Band of Umpqua Indians; Karuk Tribe; and the Klamath, Modoc

and Yahooskin Tribes as minority populations that would be impacted by substitution effects."

FEIS Vol. I, at 3-34 (Galanda Declaration Ex. 1).

During the public notice-and-comment periods for the Draft EIS, Interior received in 2022

and 2023 four comment letters from Plaintiff Cow Creek Band of Umpqua Tribe of Indians, two

comment letters from Plaintiff Karuk Tribe, and two comment letters from Plaintiff Tolowa Dee-

Ni' Nation.  Each Plaintiff also participated by speaking at public hearings concerning the

proposed action in December 2022 and January 2023.  Interior responded to the comments

received from Plaintiffs during the public hearings and in their comment letters.  FEIS Vol. I, §

3.0 (Galanda Declaration Ex. 1).  The substantive issues raised by Plaintiffs, including those

related to anticipated economic impacts from substitution effects created by the casino proposed

to be constructed on the Medford Parcel, were fully heard and responded to during Interior's public

comment and hearing processes for the Draft EIS.

Based on feedback that Interior received from Plaintiffs and other tribes through the

scoping process, as well during consultation, Interior's environmental justice analysis, and the

public comment and hearing processes, Interior evaluated the impact of the proposed action on

Plaintiffs and documented its findings in the FEIS.  Of particular relevance to Plaintiffs' claimed

irreparable harm, Section 4.7.1 discusses at length the economic effects of the proposed action,

including economic impacts on Plaintiffs' existing casinos.

Plaintiffs have been extensively involved in the NEPA process, and Interior has invested significant time and resources consulting with Plaintiffs, responding to their comments, and analyzing the impacts of the proposed action on Plaintiffs in the FEIS. This satisfies the core purpose of NEPA, as Interior is integrating environmental considerations into its decision-making processes. Plaintiffs' apparent dissatisfaction with Interior's potential decision at the end of that extensive consultation process does not render Interior's decision-making process deficient under NEPA.

Plaintiffs' citation to *Quechan Tribe of Ft. Yuma Indian Reservation v. United States Department of Interior*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010) where the court granted the plaintiff tribe's motion for a preliminary injunction related to Interior's issuance of a ROD approving a solar energy project—does not help them. There, the tribe contacted BLM early in the process regarding the important historical and cultural sites within the Project area and asked BLM to survey the area and meet with the tribal government; BLM delayed nearly three years before any meeting. *Id.* at 1118. Although BLM ultimately engaged in some communication with the tribe, the court concluded they were cursory, inadequate, and mostly informational meetings where the tribe's opinions were not sought. *Id.* "The Court therefore determine[d] the Tribe is likely to prevail at least on its claim that it was not adequately consulted as required under NHPA before the project was approved" and granted the tribe's preliminary injunction. *Id.* at 1119.

The facts here are nothing like that. Plaintiffs and Interior have been in regular communication regarding the Project, including at least 22 meetings with Interior, as well as meetings with the White House [build this out with information from Ken]. Remarkably, it appears that the Cow Creek tribe alone had more consultation sessions with the Federal Government than did the Coquille Indian Tribe.

**b. Defendants Were Not Required to Consult with Plaintiffs Under IGRA.**

Nor did Defendants have any further obligation to consult with Plaintiffs under IGRA. That is because the proposed project contemplates Interior's taking the Medford Parcel into trust for gaming purposes under IGRA's restored-land exception. *See* 25 U.S.C. § 2719(b)(1)(B)(iii). IGRA generally prohibits gaming from being conducted on lands acquired by Interior in trust for the benefit of a tribe after October 17, 1988 (the date of IGRA's enactment), subject to certain exceptions, including those set forth in 25 U.S.C. § 2719(b). One of the exceptions in § 2719(b) is for lands taken into trust as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition." *Id.* The plain language of IGRA does not require Interior to consult with nearby tribes as part of the restored-land exception. The restored-land exception never uses the word "consultation" or "consult" and instead simply requires that "lands [be] taken into trust as part of … the restoration of lands for an Indian tribe that is restored to Federal recognition," full stop. *Id.*

Plaintiffs misread the statute by citing to a consultation requirement that applies to a *different* exception in § 2719(b), known as the two-part determination exception, which unlike the other exceptions, is not intended to place eligible tribes on equal footing with other federally recognized tribes. *Scotts Valley Band of Pomo Indians v. U.S. Dep't of Interior*, 633 F. Supp. 3d 132, 167-68 (D.D.C. 2022). Specifically, as to this other exception, the statute contemplates "consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes." 25 U.S.C. § 2719(b)(1)(A). But that provision is inapplicable to the restored-land exception. There simply is no consultation requirement under IGRA for lands taken into trust pursuant to the restored-land exception.

Plaintiffs also represent that Defendants' application of IGRA's restored-land exception to the proposed action is contrary to IGRA's unambiguous language and is otherwise arbitrary and capricious. *See* Pls.' Mem. at 25 n.9. But Plaintiffs did not plead this claim in their complaint "because the ROD … permitting Defendants to take the land into trust under the restored-land exception" has "not yet been issued" and therefore such "challenge is not yet ripe for judicial review." *Id.* Plaintiffs' attempt to circumvent this ripeness issue by claiming that Defendants have not satisfied their consultation requirements under IGRA only underscores Plaintiffs' failure to state a valid claim.

## II.    Plaintiffs' Claims of Irreparable Harm Lack Merit.

### A.    Plaintiffs Do Not Have a Protectable Interest in Maintaining Regional Gaming Monopolies.

Plaintiffs fearmonger about the consequences of Coquille's gaming on the Medford Parcel. But their desire to avoid healthy market competition is irrelevant. Federal courts have repeatedly determined that "competition alone is not enough of a detrimental impact to sustain [a] NEPA challenge." *Citizens for a Better Way v. U.S. Dep't of Interior*, No. 12-cv-3021, 2015 WL 5648925, at *9 (E.D. Cal. Sept. 24, 2015), *aff'd sub nom. Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584 (9th Cir. 2018); *see also Stand Up for California! v. U.S. Dep't of Interior*, 919 F. Supp. 2d 51, 76 (D.D.C. 2013); *Stand Up for California! v. U.S. Dep't of Interior*, 879 F.3d 1177, 1187–90 (D.C. Cir. 2018); *Kalispel Tribe of Indians v. U.S. Dep't of Interior*, 999 F.3d 683, 690–91 (9th Cir. 2021).

Moreover, IGRA does not guarantee that tribes operating existing facilities will conduct gaming free from competition or preserve monopoly status for first-in-time tribal gaming facilities. *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 947 (7th Cir. 2000) (nothing in IGRA "suggests an affirmative right for nearby tribes to be free from economic competition"). IGRA is

not designed to grant monopolies to tribes with existing casinos, but to "'promot[e] tribal economic development'" for all tribes. *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 468 (D.C. Cir. 2007) (quoting 25 U.S.C. § 2702(1)).

Even on their own terms, Plaintiffs' claims of irreparable harm fail. Plaintiffs dismiss the harm Coquille stands to suffer from delay as "purely commercial" harm to the proposed "project's promoters." Pls.' Mem. at 31, 33. By contrast, Plaintiffs, themselves already successful gaming tribes, claim *they* will suffer irreparable harm because they purportedly stand to lose a portion of their customer base, resulting in lost gaming revenue, which Plaintiffs say will cause them to make cuts to governmental programs and jobs. Pls.' Mem. at 26–33. For starters, if these are irreparable harms, then Coquille's interests must likewise be credited. But more fundamentally, to the extent Plaintiffs enjoy revenue from gaming in Jackson County, they do not have an entitlement to the exclusive enjoyment of that revenue. To the contrary, Coquille is the only tribe that Congress has determined is entitled to restore its land base with lands in Jackson County. *See* CRA §§ 2(5), 5(a). And all commercial decisions made by Plaintiffs to target patrons in the Medford area, or to open new facilities, or expand facilities in the area were made with full knowledge of Coquille's application. Plaintiffs do not have a protectable interest in maintaining regional gaming monopolies.

### B. The Substitution Impact on Plaintiffs Does Not Constitute Irreparable Harm Justifying Issuance of the Proposed TRO.

Plaintiffs argue that they will be irreparably harmed because of substitution effects caused by a Class II gaming operation on the Medford Parcel.[4]

---

[4] Under IGRA, "Class II gaming" is defined as bingo and games similar to bingo, including electronic bingo games, but excludes casino style games such as slot machines, craps, roulette and banked card games.

Rebutting Plaintiffs' hysterics requires, at the outset, some context. Today, the State of Oregon operates one or more mini-casinos in every neighborhood throughout the State. The Oregon Lottery operates more than 12,000 slot machines a/k/a video lottery terminals at many of its 4,000 retailers in the State. This is in addition to traditional Lottery "draw and scratch" tickets mobile sports wagering available on every cell phone and laptop located anywhere within the State. The Oregon Lottery official webpage[5] boasts that Jackson County is host to 115 Oregon Lottery retailers, which offer slot machines. That translates to 115 mini-casinos spread throughout Jackson County. Against that backdrop, it is simply not plausible that Coquille's proposed gaming operation would represent a sea change for Plaintiffs.

In any event, Plaintiffs' claims about substitution effects are undermined by the record evidence, which show modest temporary effects. The FEIS's competitive-effects analysis, prepared by Global Market Advisors in 2019 and updated in 2023, concluded that Plaintiffs' gaming operations will experience a small, temporary substitution effect, perhaps 20 or 25 percent. Global Market Advisors, Updated Substitution Effects Analysis for the Coquille Medford Project, June 2023, FEIS Appendix O ("2023 GMA Report") at 32. The record shows that this substitution effect "is expected to decline in subsequent years, as market growth and patron gaming preferences within the market area stabilize." Global Market Advisors, Impact Study for the Coquille Development Project, August 2019, FEIS Appendix E ("2019 GMA Report") at 68 and 89–90. As the FEIS reflects, "multiple casinos across the U.S., including facilities similar in size to the Karuk and Cow Creek facilities, have undergone similar gaming revenue impacts due to increased competition and remain open and profitable." FEIS Vol. I, 3-16 (Galanda Declaration Ex. 1).

---

[5] http://www.Oregonlottery.org/retailer/where-to-play (last visited Dec. 31, 2024).

Plaintiffs' claims of irreparable harm contradict that record and those findings, suggesting they will experience a "*permanent*" substitution.  Pls.' Mem. at 30 (emphasis in original).  But Plaintiffs' claim rests entirely on a one-sentence assertion in a declaration from a largely discredited expert.  *See* Pls.' Mem. Ex. 3 at 10–11 (Meister declaration asserting that, "given its close proximity to a significant portion of Seven Feathers Casino Resort's existing players, the substitution effect is going to be permanent" (emphasis omitted)).[6]

The experience of multiple casino openings in Oregon shows that substitution effects are temporary and do not cause significant harm to existing operations.  For instance, a competing tribe and the Oregon Lottery warned that the 2017 opening of the Cowlitz Tribe's Class III Ilani Casino in Clark County, Washington, just over the Oregon border, would cut thier respective gaming revenue by 40%. However, a year after the Cowlitz casino opened, the Oregon State Office of Economic Analysis in a report to the Oregon Lottery board stated:

> Video lottery sales in zip codes along the Oregon-Washington border in the Portland region have fallen around 15 percent, instead of the 40 percent expected. Our office was not alone in over-estimating the initial impact of the new casino. The Confederated Tribes of the Grand Ronde, owners of the Spirit Mountain Casino, which was previously the closest casino to the Portland metro region, announced back in the fall that sales had fallen around 17 percent, relative to the previous year, whereas the forecasted sales would fall by 40 percent.

---

[6] In 2013, the same expert (Alan Meister, then with Nathan Associates, Inc.) provided similar reports for the Kalispel Tribe in its opposition to an application by the Spokane Tribe for the operation of a Class III casino a mere three miles from the Kalispel Tribe's Northern Quest Casino resort, forecasting devastating losses in revenue.  *Kalispel Tribe*, 999 F.3d at 686.  Despite these dire forecasts, Kalispel's Northern Quest Casino has now tripled the size of its gaming floor as part of a $275 million expansion project completed in 2023.  *See New Hotel Expansion Opening May 1 Makes Northern Quest Resort and Casino the Largest Casino Resort in Washington State,* Tribal Gaming and Hospitality (Apr. 28, 2023), attached to Declaration of Margaret Simpson ("M.Simpson Declaration") as Exh. B.

*See*, Oregon Office of Economic Analysis, Lottery and Gaming Outlook, 2019[7]; *see also* Nigel Jaquiss, *The Cowlitz Tribe's Ilani Casino Has Hurt Oregon Lottery and Spirit Mountain Casino Less than Expected*, Willamette Week (May 25, 2018)[8].

Coquille had its own experience of recovery from substitution effects in 2015, when the Confederated Tribes of Coos, Lower Umpqua, and Siuslaw Indians (the "Coos Tribe") opened a Class II gaming facility in Coos Bay, a mere four miles from Coquille's Mill Casino hotel & RV Park.  *See* Declaration of Judy Farm ("J.Farm Declaration), ¶ 8; M. Simpson Declaration, ¶ 11 . While Coquille's revenues experienced an initial drop for the first five months, they fully returned to their original level in just 24 months.  *See* M. Simpson Declaration, ¶ 11.  Together, the two tribes grew the market such that both gaming facilities are now viable sources of tribal governmental revenue.  *See* M. Simpson Declaration, ¶ 11.

The establishment of some temporary substitution effect on Plaintiff Tribes, however, does **not** establish that the three Plaintiffs Tribes will be unable to fund governmental services or will need to lay off employees, as alleged.  Plaintiffs submit Declarations with conclusory unsubstantiated claims that the loss of gaming revenue will cause such impacts on governmental services, but the actual circumstances requires this Court to reject those claims.

Cow Creek, for example, provides substantial per capita payments to its members pursuant to a Tribal Revenue Allocation Plan approved by the Department of the Interior pursuant to 25 C.F.R. Part 290. It is illegal for a tribe to make per capita payments funded from gaming revenue to its members without an approved Tribal Revenue Allocation Plant in place. 25 C.F.R. § 290.10. For the Department to approve a plan the tribe, *inter alia,* must "reserve an adequate portion of net

---

[7] https://oregoneconomicanalysis.com/2019/02/13/lottery-and-gaming-outlook-2019.
[8] https://www.wweek.com/news/2018/05/25/the-cowlitz-tribes-ilani-resort-casino-has-hurt-oregon-lottery-and-spirit-mountain-casino-less-than-expected/.

gaming revenues. . . [t]o fund tribal government operations or programs (and) to provide for the general welfare of the Tribe or its members . . ."  25 C.F.R. § 290.12(b)(1)(i)-(ii). Further, the tribe's application "must contain detailed information to allow the (Appropriate Bureau Official) to determine that it complies with this section and IGRA particularly regarding funding for tribal governmental operations or programs and for promoting tribal economic development." 25 C.F.R. § 290.12(b)(2). The Cow Creek Tribe's ability to secure federal approval of a Tribal Revenue Allocation Plan is an attestation that its gaming facility generates sufficient revenue to fully fund its governmental programs and services, and more.

Moreover, Cow Creek has enjoyed incredible success in gaming and non-gaming businesses. Public records indicate that they have amassed about $200 million in real estate holdings. Cow Creek has received a 17,000-acre forest (more than three times the size of the Coquille Forest) at no cost. They have going concerns in diverse array of businesses some of which are over a hundred miles away. A 2006 public bond financing document, FEIS Volume I (Attachments) at pp. 437-517[9], reveals that Cow Creek law taxed 100% of gaming revenue and set aside 80% of that taxed revenue purely for economic development:

> Under the [Cow Creek Gaming Revenue Code], the Gaming Net Revenue Tax is collected and remitted to the Tribe monthly; 80% of the proceeds of the Gaming Net Revenue Tax are allocated to provide funding for Tribal economic development and the remaining 20% of Gaming Net Revenue Tax proceeds are legally dedicated to Tribal governmental operations (10%), long- term investment programs (5%), and Tribal member per capita benefits (5%).

The Cow Creek Tribe's ability to provide per capita payments to its members, together with its amassed real estate holdings and diverse economic empire, and its ability to fund its Tribal

---

[9] https://coquille-eis.com/wp-content/uploads/2024/11/2_Coquille-FTT-and-Gaming-Facility-Final-EIS-Vol-I-Attachments-Nov-2024-508C.pdf.

governmental programs with a mere 10% of its gaming revenue, render Cow Creek's conclusory assertion that the substitution effect will devastate its ability provide governmental services to its members to be incredulous and disingenuous.

Similarly, the Karuk Tribe submitted comments in the NEPA process attesting that the Karuk Tribe is currently "using all casino profits to pay off the casino debt and to reinvest in the expansion of the casino." FEIS Volume I (Attachments) at T-27 p. 106 / ii) at 3-37. The FEIS appropriately notes: "While the reduction in gaming revenue quantified in GMA's analysis would have an impact on the Tribe's casino operations, it would therefore not have a direct impact on the Tribal government's source of funding. . ." FEIS Vol. I (Responses to Comments) Response to Comment T10-17 at 3-37 (Galanda Declaration Ex. 1).

At bottom, Plaintiff Tribes' attempts to translate temporary substitution effects as irreparable harm that justifies the issuance of a TRO fail. The reality is that the Plaintiff Tribes will survive a new environment where they compete with Coquille, with each other, and primarily with the substantial established operations of the Oregon Lottery for the Jackson County gaming patron. Existing governmental services will not incur substantial cuts and lay-offs.

As the record here shows, and Plaintiffs fail to credibly refute, any substitution effects will be modest and temporary. They do not reflect a permanent economic threat to Plaintiffs' gaming operations, which are already up and running—and are highly profitable. They do not translate into reductions in governmental funding or services to tribal members. For these reasons, too, Plaintiffs' claims about the deleterious effects of lost revenues are inaccurate.

### C. Plaintiffs' Remaining Claims of Irreparable Harm Are Spurious.

Plaintiffs lob several additional supposed harms, but none reflects reality.

First, the allegation of non-economic harm—specifically that the project "may also irreversibly alter the Medford site, and any remaining environmental, ecological, and cultural resources located thereon," Pls.' Memo at 28—is spurious. Plaintiffs provide no evidence or reference to the record to support these allegations.[10] As described in the FEIS at Vol. II, Section 2.2.1 (Galanda Declaration Ex. 2), this is not a project that disturbs undeveloped land or even involves a significant change of use. Rather, it is revamping a bowling alley and State Lottery retail operation in a heavily developed area into a Class II tribal gaming facility.

Second, Plaintiffs also assert irreparable harm to area charities, reasoning that charitable organizations have come to rely on tribes to make considerable donations. Pls.' Mem. at 26–27. Their analysis fails to take into account that Coquille, too, dedicates a portion of its casino revenues to charitable organizations through its Potlatch Fund and the Coquille Community Fund; indeed, virtually all tribal casinos have proven to be good neighbors with local charities. *See* Declaration of Kyle ViksnHill ("K.Viksnehill Declaration") ¶¶ 8-11. *See also*, February 10, 2023 comment letter to DEIS from George Summers (FEIS Volume I (Attachments) I-81 (p. 689) and transcript testimony of Oregon State Representative Lily Morgan, FEIS Volume I (Attachments) pp. 735-736. In addition to the Coquille Community Fund, which is based on compact provisions similar to those found in Cow Creek's compact, Coquille has established as a matter of Tribal law, a Potlatch Fund that dedicates a portion of proceeds from the proposed projects to charitable organizations in Jackson County. K.Viksnehill Declaration, ¶¶ 10-11. To date, the Tribe had

---

[10] Plaintiffs' brief attributes the factual assertion to Thompson Declaration, ¶¶ 17, 20 and Attebury Declaration, ¶¶ 3–4. The referenced passages to the Thompson Declaration involve the number of Lucky 7 casino employees and the Tribal Gaming Ordinance's recitation of IGRA's restrictions on the use of gaming revenues. The referenced passages of the Attebury Declaration involve a description of the Karuk Tribe and its recent history of damage from wildfires. Neither Declaration supports the assertion in any respect.

distributed more than $ 8.7 million in grants from tribal gaming revenue. K.Viksnehill Declaration, ¶ 9. Hence any loss of revenue stream to charitable organizations is likely to be recovered by an increase in Coquille donations. Indeed, the fact that the Project will generate nearly $12 million in new (not substituted) revenue, 2023 GMA Report at 3, translates into a greater pool of revenue from which charitable donations can be made.

### III.    The Balance of the Equities Tips Sharply in Coquille's Favor.

#### A.    Coquille Will Suffer Irreparable Harm if the TRO Is Granted.

While Coquille maintains that there is no final agency action subject to valid challenge, *see supra* at 3-7, accepting Plaintiffs' framing of this case, Coquille will suffer clear irreparable injury from a TRO.  First, such relief would halt the Tribe's efforts to establish a Class II gaming facility to improve its members' economic and employment prospects.  Second, relief would prevent the Tribe from even maintaining the current—already insufficient—level of governmental services and further forestall funding the Tribe's documented unmet needs.  Each of these harms is discussed in more detail below.  But they require important context to fully comprehend.

For millennia prior to European settlement, the Coquille Indians lived and prospered in what is now southwest Oregon.  *See* 2013 Unmet Needs Report ("UNR"), attached to K.Viksnehill Declaration as Exh. A at 5-6 and 19.  After the discovery of gold in the 1850s, the Federal Government sought to facilitate Anglo settlement in the West via a number of policies to remove and assimilate the native inhabitants.  Through those policies, the Coquille were systematically deprived of the resources and infrastructure necessary to thrive—and variations of these destructive policies persisted over more than a century.  UNR at 6, 20.  After its federal recognition was restored in 1989, Coquille assumed the responsibility to govern its people, but was provided few resources to rebuild the cultural, social, and economic structures of the Tribe or to restore its

land base.  Thirty-five years after restoration, Coquille continues to address the legacy of these destructive policies of the past.

Today, there are approximately 1,200 enrolled Coquille members and this number is growing.  UNR at 6–7.  Approximately 20% of Coquille's members live along the Interstate corridor between Medford and Eugene, Oregon.  UNR at 7–8.  These members endure a significantly higher unemployment rate and lower household income rate than the surrounding non-native community, UNR at 6—a problem that continually demands the Tribe's attention and proactive efforts.  Coquille therefore seeks opportunities to invest in economic development, education, job training, and employment opportunities—including via the land-into-trust application at issue in this litigation, which would allow Coquille to increase economic development and employment opportunities for members, as well as provide income to fund critical resources.  UNR at 6.

### 1.  A TRO Will Cause Coquille Irreparable Harm by Upending Its Efforts to Engage in Class II Gaming Activities on the Medford Parcel.

Coquille is ready to commence Class II gaming on the Medford Parcel.  M. Simpson Declaration, ¶¶ 4-5.  That readiness reflects extensive efforts and resources expended by Coquille to secure Class II gaming equipment, to implement internal controls for the project, to oversee inspections to ensure the gaming operation adequately protects the public's health and safety, and to hire, vet, and train staff to ensure that the gaming facility complies with all operative regulations.  Declaration of Larry Simpson ("L. Simpson Declaration") ¶¶ 3-4.  The Commission has incurred tens of thousands of dollars in such expenses.  L. Simpson Declaration, ¶ 5.  (That figure does not include the $ 16.9_ million Coquille has devoted to getting the Medford Parcel taken into trust.  J. Farm Declaration, ¶ 3.)  What's more, tribal employees (already hired and trained) are planning to move to Jackson County to work at the Medford Parcel gaming facility.  M. Simpson Declaration,

¶ 5.  And a transition team is now in place to facilitate the opening and full staffing of the Class II gaming operation.   M. Simpson Declaration, ¶ 5.   The loss of that investment, and the consequential loss of jobs, represents real harm to the Coquille Indian Tribe and all its members.

Further, a TRO or PI will immediately result in lost gaming revenue that the Tribe is entitled to enjoy from these gaming operations.   Projections show that the estimated lost governmental revenue will total $30,000 on day one.  M. Simpson Declaration, ¶6.  That figure would exceed $900,000 in the first month and $10 million in the first year.   M. Simpson Declaration, ¶ 6.  And those sums do not reflect the losses caused by the 12-year delay that the project has already endured, which is estimated to cost Coquille more than $300 million in lost governmental revenue, 160 full-time employment positions, and $62 million in wages. M. Simpson Declaration, ¶ 7.  In short, the lost revenue and compromised employment resulting from a TRO are staggering and unrecoverable.

### 2. A TRO Will Irreparably Harm Coquille by Exacerbating Coquille Citizens' Unmet Needs.

The economic and employment harms have cascading—and devastating—consequences. That is because this revenue and these jobs are needed to fulfill the profound unmet needs of the Tribe.

As discussed above, Coquille is responsible for providing programs and services that will help its enrolled citizens address their health needs, overcome educational deficits and employment obstacles, remedy deficiencies in housing and health care, live their lives in dignity and with purpose, and honor and perpetuate their cultural identity.  In 2013, Coquille prepared the UNR, which documented that the Tribe could not sustain its then-existing level of governmental services and projected a shortfall of $1 million in 2013 and $13 million annually by 2022.  UNR at 4, 10. That revenue, already lacking, was needed to preserve the presently deficient level of needed

services, including sustaining a health clinic and community center, a small library, educational and vocational training, benefits programs such as elder, burial, and emergency assistance, land management, facilities management, public safety and police services, and housing facilities. UNR at 4, 10–11.

As discussed above, the Tribe stands to suffer—and has already suffered—grave losses from the delay in processing its land-into-trust application.  That financial crisis is ongoing, forcing the Tribe to devise stopgap measures to simply maintain the current level of services, much less to fund the Tribe's additional unmet needs.  The 2024 Supplement to the Unmet Needs Report ("2024 supplement to UNR"), attached to K.Viksnehill Declaration as Exh. B demonstrates that the Tribe has had to resort to extreme measures, tapping significant non-recurring sources of funds since 2012 to address the annual and cumulative deficits in the UNR including:

- Sale of major businesses of the Tribe, trading long-term profitability for immediate cash flow;

- Deferral of maintenance expenditures for existing tribal businesses, freeing up immediate cash flow but resulting in deterioration of the business assets and respective competitive positions;

- Lack of growth capital expenditures in existing and new businesses to grow future earnings;

- Significant new debt to support the acquisition of new health clinic space needed to replace an old, outdated, and insufficient health clinic space;

- Significant new debt to fund economic development investments;

- New debt has largely been collateralized by the Tribe's self-funded endowments, putting at risk money that the Tribe had saved to provide programs and services for future generations;

- Significant refinancing of existing debt to extend maturities and reduce annual debt service, freeing up more annual cash flow for the Tribe at the expense of increased total payments over the life of the debt; and

- Significantly reduced savings rates for endowment funds, resulting in loss of future compounded earnings and the ability to provide for related programs and services in the future.

*See* 2024 Supplement to UNR at 2.

Plaintiffs' contrary account of Coquille's financial picture blinks at reality. Plaintiffs suggest (Pls.' Mem. at 3–4) that Tribal One, a federally chartered corporation owned by Coquille is "a significant source of revenue for the Coquille." Not true. While Coquille is proud that Tribal One is a growing enterprise, it has not been a new source of funds that can be directed toward the Tribe's unmet needs. Farm Declaration, ¶¶ 4-6. Indeed, the inability to direct capital into Tribal One from the Tribe's gaming operation has placed Tribal One at a disadvantage compared to more successful gaming tribes, like Plaintiffs themselves. Farm Declaration, ¶ 4. Plaintiffs lack direct knowledge of Tribal One's economic realities. Their only indirect "evidence" of revenue is a reference to government contracts. Pls.' Mem. at 3–4. But, of course, the award of contracts does not equate to profit. Far from it. Profit margins for 8(a) contracts are typically in single digits and can be zero, or even a loss. Farm Declaration, ¶ 6. Plaintiffs also exaggerate the stakes of being named in a government contract; that status merely allows Tribal One to compete with other named entities for task orders to perform a small portion of the government contract—in essence, Plaintiffs are citing figures for entire contracts, but Tribal One is just one of many subcontractors. Farm Declaration, ¶ 6. Tribal One is not a silver bullet that can provide Coquille with the revenue needed to maintain, much less expand, tribal services.

Casting further afield, Plaintiffs then suggest (Pls.' Mem. at 3–4) that Coquille can generate needed revenue from the sale of timber. Again, not so. Revenues from timber sales have dropped precipitously in the last five years from an annual average of $440,000 per year over the last five years to $108,000 per year over the last three years. K.Viksnehill Declaration, ¶ 6. Much of Coquille's forest lands are designated as preserve or are otherwise not managed by the Tribe to support commercial timber harvests. K.Viksnehill Declaration, ¶ 6. Plaintiffs' account of Coquille's financial prospects is again wildly inaccurate.

The loss of revenue from any further delay of the Class II gaming operation has existential stakes for Coquille.  There are simply no available revenue streams to maintain the Tribe's current service levels or to fund additional unmet needs including infrastructure projects (such as a wastewater treatment facility, stabilization of failing buildings, and additional community and educational buildings), expanded scholarship programs, language-restoration efforts, enhanced elder benefits, new and affordable housing, repatriation of tribal artifacts, and expansion of the forestry program.  UNR at 13–16.  The cumulative unmet needs over the past decade are now approaching, and perhaps exceeding, a third of a billion dollars.  UNR at 17.

If Plaintiffs' motion is granted, the resulting lost revenue would significantly and irreparably harm Coquille's ability to fund existing and badly needed governmental programs.

## CONCLUSION

Cow Creek's motion should be denied.


Dated: December 31, 2024                                    Respectfully submitted,


                                                           /s/ Keith M. Harper
Scott Crowell*                                             Keith M. Harper, D.C. Bar No. 451956
Crowell Law Offices–                                       Sam Hirsch
  Tribal Advocacy Group                          Elizabeth B. Deutsch
1487 W. State Route 89A, Suite 8                           Jenner & Block LLP
Sedona, AZ 87337                                           1099 New York Ave, N.W. Suite 900
(425) 802-5369                                             Washington, D.C. 20001
scottcrowell@clotag.net                                    (202) 639-6000
                                                           kharper@jenner.com
                                                           shirsch@jenner.com
                                                           edeutsch@jenner.com


                                                           *Counsel for the Coquille Indian Tribe*

                                                           *\*Pro Hac Vice Motion Forthcoming*

                                                           *Counsel for the Coquille Indian Tribe*

*Pro Hac Vice Motion Forthcoming

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 31, 2024, I caused the foregoing document to be electronically filed with the Clerk of the Court for the District Court for the District of Columbia by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


<u>/s/ Keith M. Harper</u>
Keith M. Harper