UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE COW CREEK BAND OF <br> UMPQUA TRIBE OF INDIANS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF THE <br> INTERIOR, *et al.*, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case No. 24-cv-03594 (APM) |

**MEMORANDUM OPINION AND ORDER**

**I.   INTRODUCTION**

This case is once more before the court on Plaintiffs' second motion for emergency injunctive relief. Plaintiffs are three Indian Tribes—the Cow Creek Band of Umpqua Tribe of Indians, the Karuk Tribe, and the Tolowa Dee-ni Nation—located in Southern Oregon and Northern California. They challenge the taking of certain land in Medford, Oregon, into trust for Intervenor-Defendant Coquille Indian Tribe ("Medford parcel"). Federal Defendants took the Medford parcel into trust on January 10, 2025, and Coquille began operating a gaming facility on the land soon thereafter. Plaintiffs now seek "a mandatory injunction immediately divesting Federal Defendants of trust title to the Medford parcel" and a "prohibitory injunction enjoining . . . Coquille from unlawfully gaming on the parcel." As the court writes primarily for the parties, it does not address the case background except as needed to resolve the motion. Because Plaintiffs have failed to establish irreparable harm, their motion is denied.

## II.  LEGAL STANDARD

Motions for temporary restraining orders and preliminary injunctions are analyzed under the same standard. *See, e.g.*, *McCray v. Biden*, 574 F. Supp. 3d 1, 7 (D.D.C. 2021); *Postal Police Officers Ass'n v. U.S. Postal Serv.*, 502 F. Supp. 3d 411, 418 (D.D.C. 2020); *Nguyen v. U.S. Dep't of Homeland Sec.*, 460 F. Supp. 3d 27, 33 (D.D.C. 2020). These "extraordinary" remedies "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (citation omitted). To prevail, a moving party must demonstrate that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008) (citations omitted). Because the court resolves Plaintiffs' motion on the element of irreparable harm, it does not address the other three factors.

Irreparable harm "is the *sine qua non* for obtaining a preliminary injunction—it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases." *M3 USA Corp. v. Qamoum*, No. 20-cv-2903 (RDM), 2021 WL 2324753, at *19 (D.D.C. June 7, 2021) (citation omitted). In this Circuit, it is a "high standard" to meet. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "[T]he injury 'must be both certain and great; it must be actual and not theoretical.'" *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Also, "the injury must be beyond remediation." *Id.* "The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297–98 (quoting *Wis. Gas*, 758 F.2d at 674). Finally, "[b]are allegations of what is likely to occur" and "conclusory assertions of potential loss" will not suffice.

*Wis. Gas*, 758 F.2d at 674; *M3 USA Corp.*, 2021 WL 2324753, at *19 (citation omitted).  If the moving party fails to substantiate its claim of irreparable harm, it is not entitled to injunctive relief. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation omitted).

### III.   ANALYSIS

Plaintiffs assert five types of irreparable harm: (1) financial losses that "will decimate the core Tribal governmental services and programs in all three communities," Pls.' Mot. & Mem. in Supp. of Emergency Mot. for TRO & Prelim. Inj., ECF. No. 32 [hereinafter Pls.' Mot.], at 38; *id.* at 10–12; (2) a "here-and-now" injury arising from "being subjected to an unlawful [National Environmental Policy Act] review process that was based on unconstitutional [Council for Environmental Quality] regulations," Pls.' Reply in Supp. of Pls.' Mot., ECF No. 54 [hereinafter Pls.' Reply], at 10; Pls.' Mot. at 38; (3) adverse impacts on employees and local charities that depend on Plaintiffs' gaming facilities, Pls.' Mot. at 11, 41; (4) environmental harms resulting from reduced gaming revenues, *id.* at 12; and (5) public confusion arising from the "false impression that Coquille is aboriginally or historically connected to Jackson County[, Oregon,] and the Rouge River Valley," Pls.' Reply at 11; Pls.' Mot. at 9–10.

The court separately addresses the first and second of these alleged harms and summarily considers the third, fourth, and fifth.

#### A.   Plaintiffs' Projected Financial Losses Do Not Constitute Irreparable Harm

Plaintiffs declare that their individual gaming "enterprises risk *going out of business*" if the Coquille's new casino is permitted to continue operations during the pendency of this suit. Pls.' Mot. at 38 (emphasis in original).  Plaintiffs' proof of certain and imminent business failure falls well short of establishing irreparable harm.

3

       *1.*    *The Final Environmental Impact Statement*

Plaintiffs first point to the Final Environmental Impact Statement ("FEIS"), which they say estimates substantial drops in revenues for all three tribes. Pls.' Mot. at 10. The FEIS projects that, because of Coquille's Medford casino, Cow Creeks's, Karuk's, and Tolowa's gaming revenues will decline by 21.3%, 23.4%, and 5.3%, respectively. Decl. of Gabriel S. Galanda, ECF No. 2-2 [hereinafter Galanda Decl.], Ex. 2, FEIS Vol. II at 4-22. Plaintiffs accurately cite the FEIS but without the relevant context. The numbers cited by Plaintiffs are loss projections for the year *2029*, when the facility is expected to be fully operational. Galanda Decl., Ex. 2, FEIS Vol. II at 4-22–4-23. The FEIS's near-term loss estimates for 2025 are far lower: 7.1% for Cow Creek's Seven Feathers Casino Resort; 9.4% for Karuk's Rain Rock Casino; and 2.2% for Tolowa Dee-ni's Lucky 7 Casino. *Id*. No Plaintiff asserts that their facility would be placed at "imminent" risk of going out of business within the next year if it were to incur losses in line with these projections.

Plaintiffs respond that they have received no assurance that Coquille will develop their gaming facility on the timeline assumed by the FEIS. They fear that if Coquille move faster, the higher loss projections could afflict them much sooner. Pls.' Mot. at 40 (arguing that "there is no basis [in the FEIS] to assume Coquille will conduct its gaming operation in 'phases'"). Irreparable harm, however, cannot rest on speculation. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (stating that "simply showing some possibility of irreparable injury" is not enough) (internal quotation marks and citation omitted). Plaintiffs have not offered any evidence to show that Coquille intend to rapidly accelerate their gaming operations to create the magnitude of losses that the FEIS estimates is years away.

*2.     The Work of Alan Meister*

Next, Plaintiffs cite the work of an expert economist, Alan Meister, hired by Cow Creek and Karuk to assess the impacts of Coquille's casino on their respective gaming facilities. Meister prepared initial reports in February 2023 and supplemental reports responding to the FEIS's economic analysis in December 2024. Decl. of Alan Meister, ECF No. 2-4 [hereinafter Meister Decl.], Exs. 1, 3 (Cow Creek); Decl. of Russell Attebery, ECF No. 2-6 [hereinafter Attebery Decl.], Exs. RA-1, RA-2 (Karuk). He opines as to both Tribes that the "substitution effect" predicted in the FEIS—that is, the loss of revenues due to Plaintiffs' customers taking their business to the Medford facility instead—is "going to be *permanent*." Pls.' Mot. at 41 (citing Meister Decl., Ex. 3 at 11) (emphasis in original). Meister also estimates higher revenue losses as compared to the FEIS. He opines that, because of the Medford facility, Cow Creek's Seven Feathers Casino will lose approximately 28.5% of its total annual gaming revenues and 52.1% of its current non-gaming revenues. Meister Decl., Ex. 1 at ii–iii. Karuk's Rain Rock Casino will lose approximately 37.0% of its total annual gaming revenues and 51.7% of its current non-gaming revenues. Attebery Decl., Ex. RA-1 at iii.

Meister's work does not help Plaintiffs for two reasons. First, he does not establish that irreparable harm is "certain to occur." *Wis. Gas*, 758 F.2d at 674. And second, he does not say that the economic injuries will occur "in the near future." *Id.* Both shortcomings are fatal to establishing irreparable harm. *See White v. Florida*, 458 U.S. 1301, 1302 (1982) ("Although White's application establishes that he may suffer irreparable harm at some point in the future, there is no indication that the harm is imminent.").

In his initial reports, Meister opines only that the revenue losses "*may* threaten the viability" of Cow Creek's and Karuk's gaming facilities. Meister Decl., Ex. 1 at iii (emphasis

5

added); Attebery Decl., Ex. RA-1 at iii.  Meister assumed that, following a 12-month construction period, the Medford Casino would open on January 1, 2025, with 650 Class II gaming machines and would operate at 85% in 2025 and 100% in 2026.  Meister Decl., Ex. 1 at 8, 13; Attebery Decl., Ex. RA-1 at 7, 11.  Based on those assumptions, he predicted that Cow Creek's revenue losses of 28.5% and Karuk's revenue losses of 37% would occur "by calendar year 2026."  Meister Decl., Ex. 1 at ii–iii; Attebery Decl., Ex. RA-1 at ii–iii.

Reality has not borne out those assumptions.  The Medford facility has opened but without any apparent period of construction and with a small fraction of the 650 Class II gaming machines that Meister assumed.  *See* Pls.' Mot., Decl. of Vickie Camarena, ECF No. 32-9 at ¶ 6 (stating that, on January 12, 2025, Camarena observed "eight slot machines up and running and approximately 14 slot machines that were not turned on").  Coquille anticipate that the Medford property will have 150 Class II gaming machines in place by the end of the first quarter of 2025.  Def.-Intervenor Coquille Indian Tribe's Opp'n to Pls.' Mot., ECF No. 52 [hereinafter Coquille's Opp'n], Second Decl. of Margaret Simpson, ECF No. 52-1, ¶ 5.  Coquille then expect to develop the facility and infrastructure needed to accommodate 650 Class II gaming machines but "no sooner than the first quarter of 2026."  *Id.*  Thus, by the end of the first *quarter* of 2025, the Medford facility will have less than a quarter of the gaming capacity that Meister assumed would be available on the first *day* of 2025.  This timetable pushes back when Meister's predicted revenue losses may occur by at least a year, if not more.  Therefore, neither Cow Creek nor Karuk is likely to suffer the magnitude of losses projected by Meister "in the near future."[1]

---

[1] Jeri Lynn Thompson, Chair of Tolowa Tribal Council, states in a declaration that, "[o]nce the Coquille's proposed second casino in Medford opens and begins operations, the Tolowa Casino is expected to experience a significant **loss** of approximately $1.2M (-13.4%) in gaming revenue due to 'substitution effects.'"  Decl. of Jeri Lynn Thompson, ECF No. 2-5, ¶ 25 (emphasis in original).  Thompson does not, however, explain the basis for that projection.  She does say that the loss estimate is "based on a similar financial analysis conducted by Cow Creek and the Karuk Tribes." *Id.*  In that case, Tolowa likewise will not incur "great" and "imminent" financial losses that put the viability of its gaming enterprise at risk.

Plaintiffs also point to a letter that Oregon's U.S. Senators submitted to then-Secretary of Interior, Deb Haaland, on December 1, 2023. Pls.' Mot. at 38–39. The Senators wrote that a Medford gaming facility "will irreparably deprive at least three other Tribes of significant gaming revenues from their existing casinos," resulting in "devastating economic impact." Galanda Decl., Ex. 6 at 436–37 (CM/ECF pagination). The letter does not, however, offer any data or other evidence that would cause the court to view the anticipated financial impacts as likely to be more dire or immediate than projected by the FEIS or Meister.

### 3.     Effects on Tribal Services and Projects

To be fair, Plaintiffs' claimed financial harms cannot be treated merely as lost profits, as if they were purely private enterprises. There is no dispute that Plaintiffs fund tribal programs and services with gaming revenues and that a drop in those revenues will adversely affect their ability carry out those functions. *See, e.g.,* Pls.' Mot., Decl. of Troy Ralstin, ECF No. 32-6 [hereinafter Ralstin Decl.], ¶¶ 6–10 (describing impacts of the loss of $1.2 million in annual gaming revenues on Tolowa Dee-ni's programs and services); *id.*, Decl. of Gregg Hervey, ECF No. 32-8, ¶ 4 (stating that revenue losses of 28.5% in 2023 at the Crow Creek facility would have "resulted in 12.3% decrease in Tribal government funds available in 2023").

The question for the court, however, is whether the immediate impacts on tribal programs and services will be "certain and great." *Wis. Gas*, 758 F.2d at 674. Measured against that standard, Plaintiffs have fallen short. None have described in any detail how potential near-term revenue losses would concretely affect any program or service. They have not, for example, said that any program would have to be shut down or any service discontinued, or explained how a particular program or service would be curtailed during the pendency of this litigation. Nor have they described how they might have to reallocate resources because of a near-term drop in gaming

7

revenues. The declarations instead are largely conclusory. *See, e.g.,* Ralstin Decl. ¶ 7 (claiming that "budget cuts" "will irreparably harm key government departments and programs" and simply listing those departments and programs); Hervey Decl. ¶ 5 (describing only categorically the services and benefits that "likely" would be cut); Pls.' Mot., Decl. of Jesse Jackson, ECF No. 32-5, ¶ 13 (stating that education assistance for graduate and undergraduate students would be cut "substantially," but nowhere describing the number of students impacted or when reduced assistance would affect them). Plaintiffs must show more to secure the "extraordinary" remedy of injunctive relief. *Cobell*, 391 F.3d at 258.

Plaintiffs attempt to analogize their circumstances to those of the plaintiff tribes in *Confederated Tribes of the Chehalis Reservation v. Mnuchin*, 456 F. Supp. 3d 152, 155 (D.D.C. 2020). Pls.' Mot. at 38. *Chehalis* involved a dispute over an emergency congressional appropriation for Indian Tribes to combat the COVID-19 pandemic. 456 F. Supp. 3d at 155.[2] "These [were] not funds appropriated to carry out secondary or residual government functions." *Id.* at 163–64. It was money "that Congress appropriated on an emergency basis to assist Tribal governments in providing core public services to battle a pandemic that is ravaging the nation, including in Indian country." *Id.* at 164. The plaintiff tribes feared that the Secretary of Treasury was about to give away "a significant percentage" of the funding to entities that did not qualify for it and, absent injunctive relief, those monies would not be recoverable. *Id.* at 155, 163. The tribes also provided declarations establishing that "COVID-19 and the public health measures necessary to combat the novel coronavirus ha[d] caused their regular streams of revenue to run dry, creating a crisis in funding needed to deliver health care, procure medical equipment and supplies, and

---

[2] The *Chehalis* case had a long history after this court granted preliminary injunctive relief. This court ultimately concluded that the plaintiffs did not prevail on the merits, the D.C. Circuit reversed this court, and the Supreme Court reversed the D.C. Circuit. The court does not include citations to this extensive history, because it pertains to the merits of the dispute.

provide meals and expand food banks—just to name a few ways in which the [congressionally appropriated] funds would be put to use." *Id.* (citations omitted). On that record, this court found that the plaintiff tribes had demonstrated irreparable harm and rejected as "terribly misguided" the defendants' effort to paint the plaintiff tribes' injuries as merely "economic." *Id.* at 163, 165.

This case is not *Chehalis*. The circumstances there were unique. The suit involved a dispute over a finite pot of money that Congress had allocated to help Tribes combat the devasting effects of COVID-19 pandemic. Those effects were well supported in the plaintiff tribes' declarations. By contrast, this case involves no comparable emergent conditions and Plaintiffs' declarants have not established with any specificity the type of immediate dire consequences to tribal programs and services that would justify extraordinary relief. *Chehalis* does not support a finding of irreparable harm in this case.

### B. Plaintiffs Fail to Raise an *Axon*-Like Injury

Plaintiffs next advance what they claim is a "here-and-now," separation-of-powers injury. This theory of harm rests on the Supreme Court's decision in *Axon Enterprise v. Federal Trade Commission,* in which the Court ruled that an aggrieved party that is subject to civil enforcement proceedings before an agency can bypass the ordinary administrative process and bring an Appointments Clause challenge directly in federal court. *See* 598 U.S. 175, 195–96 (2023). Plaintiffs grasp onto the Court's description of the plaintiff's harm in *Axon* as a "here-now-injury," *id.* at 195, and claim that they too are suffering such an injury by "being subjected to an unlawful NEPA review process that was based on unconstitutional CEQ regulations." Pls.' Reply at 10; *see also* Pls.' Mot. at 37–38.

This case bears no resemblance to *Axon*. For one, *Axon* was not about irreparable harm. As the D.C. Circuit recently explained: *"Axon* answered a statutory jurisdictional question about

9

whether Congress intended to oust district courts of jurisdiction they would ordinarily have by requiring that parties instead litigate their claims through agency proceedings." *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1335 (D.C. Cir. 2024) (cleaned up). It "did not speak to what constitutes irreparable harm for purposes of the extraordinary remedy of a preliminary injunction." *Id.* at 1336.

Moreover, even if the court were to use the injury in *Axon* as an informal measuring stick for harm, the "here-and-now" injury in that case was the rare kind that "could not be remedied if a party were forced to litigate before the agency prior to raising its claims in federal court." *Id.* (citation omitted). Plaintiffs face no comparable harm here. They are in a federal judicial forum, and this court has the authority to grant a remedy in the normal course, if appropriate, under the Administrative Procedure Act (APA). *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 220 (2012) (observing that a challenge to "the Secretary's decision to take land into trust" is "a garden-variety APA claim"); *Stand Up for California! v. Dep't of the Interior*, 919 F. Supp. 2d 51, 82 (D.D.C. 2013) ("Therefore, the Court sees no cognizable limit to its jurisdiction that would preclude a future order vacating the trust transfer in this case after the transfer has already been made.") (citing *Patchak,* 567 U.S. at 227–28). Thus, even if an *Axon*-like injury were irreparable, Plaintiffs have not advanced one.[3]

---

[3] As noted in the introduction, Plaintiffs also seek as relief a "prohibitory injunction enjoining . . . Coquille from unlawfully gaming on the parcel." Pls.' Reply at 2. Plaintiffs and Coquille dispute whether such relief is foreclosed by Coquille's sovereign immunity. *Compare* Coquille's Opp'n at 9 n.4 (asserting that an injunction preventing Coquille from continued gaming "would plainly violate Coquille's tribal sovereign immunity") (citations omitted) *with* Pls.' Reply at 6 (arguing that "Coquille waived its sovereign immunity when it sought to intervene in this case"). The court need not reach this question because Plaintiffs' primary requested relief—an order directing Federal Defendants to divest the United States of trust title to the Medford parcel—is available under the APA, thus making Plaintiffs' comparison to *Axon* inapt.

### C. Other Harms Alleged by Plaintiffs Do Not Constitute Irreparable Harm

The court summarily addresses Plaintiffs' remaining claims of harm. Plaintiffs' assertion that lost gaming revenues will have adverse consequences for tribal employees and local charities suffers from the same shortcomings as their claimed economic harm: the injuries are not certain to occur in the near future. Their asserted environmental harms are even more attenuated. At most, their declarant says that reduced funding will at some future point have adverse impacts on a host of environmental interests, such as clean water, endangered salmon, and efforts to combat and mitigate climate change. *See, e.g.*, Decl. of Michael J. Haskell, ECF No. 32-4. ¶¶ 7–8. Such speculative and remote injuries do not rise to irreparable harm.

Finally, Plaintiffs' assertion that a Coquille casino in Medford will cause the public to wrongly believe that the Coquille have aboriginal and historic ties to that land lacks any evidentiary basis. For this proposition, they cite a declaration from a historian, Stephen Dow Beckham, but he supplies no proof at all as to the public's perception of Coquille's roots in the Medford area. Pls.' Reply at 11 (citing Pls.' Mot., Decl. of Stephen Dow Beckham, ECF No. 32-7, ¶¶ 45, 80, 84). They also point to a statement from the former Chair of the Cow Creek, Carla Keene, who, without any support, claims that the Coquille have falsely represented "an ancestral and historic connection to Medford and the Rogue River Valley" and that history counsels that people will "abruptly *or gradually*" "misunderstand which Tribal people belong where." *Id.* (citing Decl. of Carla Keene, ECF No. 2-3, ¶ 18) (emphasis added). Keene's musings are not evidence of irreparable harm.

## IV. CONCLUSION AND ORDER

As Plaintiffs have not carried their burden to demonstrate irreparable harm, the court need not reach the other injunction factors.  Plaintiffs' motion is denied.

Dated: February 19, 2025

Amit P. Mehta
United States District Court Judge